UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**LACEY L. POLDERDYKE**

    Plaintiffs

v.

**WAYNE COUNTY, RAFAEL WASHINGTON, MICHAEL TURNER and ROBERT DUNLAP**

    Defendants

Hon.

Case No:

_____/

**BOYLANLAW, P.C.**
By:    Karie H. Boylan (P55468)
Attorney for Plaintiff
410 W. University, Suite 201
Rochester, Michigan 48307
Phone:    (855) 926-9526
Fax:    (855) 326-9526
E-Mail:    karie@boylanlaw.net
_____/

## PLAINTIFF'S COMPLAINT & JURY DEMAND

Plaintiff states:

## JURISDICTION AND PARTIES

1. This is an action for discrimination actionable under Title VI of the Civil Rights Act of 1964 and the Michigan Elliott-Larsen Civil Rights Act, retaliation actionable under the Michigan Whistleblowers' Protection Act, MCL 15.361 et seq, and Intentional Infliction of Emotional Distress.

2. All parties reside in Wayne County.

3. All events giving rise to litigation occurred in Wayne County.

4. Defendants are being sued in their individual and official capacities.

5. The amount in controversy exceeds $25,000.00 exclusive of interest, costs, and attorney fees.

6. Defendant Wayne County is a Michigan Municipal Corporation.

7. The Sheriff's Office is an operational subunit of Wayne County and a paramilitary organization with a $144,143,656.00 operating budget (fiscal year 2015-2016). The Sheriff's Office employs more than five hundred (500) individuals. Its highest ranking positions, in order of priority, are: Sheriff, Undersheriff, Chief, Deputy Chief. Its lowest ranking position is Deputy.

8. Plaintiff Lacey L. Polderdyke is a Sheriff's Deputy.

9. Defendant Michael Turner is the Sheriff's Chief of Staff.

10. Defendant Robert Dunlap is the Sheriff's Chief of Jails and Courts.

11. Defendant Rafael Washington is the Sheriff's Deputy Chief of Courts.

12. Defendants Turner, Dunlap and Washington are supervisors with authority to undertake tangible employment actions affecting Deputy Polderdyke and authority to direct her daily work activities.

## BACKGROUND FACTS

13. Deputy Polderdyke was hired by Wayne County in 2008.

14. Defendant Washington was a high ranking officer with the Detroit Police Department before Sheriff Napoleon appointed him to his current position.

15. From 2012 through 2015, Deputy Polderdyke was assigned to the Sheriff's Office Electronic Monitoring Unit ("Tether") which is based out of Jail Division III (the Dickerson facility in Hamtramck).

16. Sometime in 2014, Defendant Washington's office was relocated from Sheriff's headquarters in Detroit to the Dickerson facility in Hamtramck.

17. Rumors circulating among Wayne County employees include:

   (a) Defendant Washington was transferred to Hamtramck because he slapped Undersheriff Daniel Pfannes' Secretary on the buttocks and said something about her appearance.

   (b) A different female Deputy was transferred from a position she liked to a position she did not like because she rebuffed and/or reported Defendant Washington's unwelcome sexual advances.

   (c) Defendant Washington routinely summoned a different female Deputy to his office by texting her: "Please cum here".

18. Defendant Washington has a reputation of being a womanizing "man whore" who preys upon subordinate female employees.

19. After he was transferred to Hamtramck, Defendant Washington summoned Deputy Polderdyke to his office. Deputy Polderdyke brought another female Deputy with her. Once they arrived, Defendant Washington told Deputy Polderdyke to massage his neck because it was bothering him. Rather than risk retaliation, she briefly rubbed the right side of his neck/shoulder then left the office.

3

20. Deputy Polderdyke did not report the shoulder rubbing incident because she knew Defendants would retaliate.

21. In December of 2015, Deputy Polderdyke resigned from Wayne County and accepted a position as a Police Officer for a different municipality. Before she left, Defendant Washington told her to call him once she got settled into her new position and that he was going to "need a whole day with [her]".

22. March 2015, Deputy Polderdyke returned to work for Wayne County.

23. On March 9, 2016, Defendant Washington told Deputy Polderdyke she should have called him when she decided to return to work for the Sheriff's Office because he could "looked out for her".

24. At the time Deputy Polderdyke resigned from Wayne County in December of 2015, she was a Courtroom Deputy assigned to the Courts division.

25. Once she received notification of her official return to work date, Deputy Polderdyke texted Defendant Washington asking that her name be added to the list of Deputies waiting for a position to open up in the Courts. He texted back that he would add her name to the list after he got his massage. She texted back that he should attend the Deputy's training regarding "quid pro quo" sexual harassment. He texted her: "That section is for you". She texted: "A lot of good its doing for me". He texted: "Right, do what you have to do, you know".

26. Deputy Polderdyke saved the text messages:

4



27.   On March 10, 2016, Deputy Polderdyke showed the text messages to a Sheriff's Office Commanding Officer.  A Prosecutor's Office employee was present.

28.   On March 29, 2016, at 7:34 p.m., Defendant Turner called Deputy Polderdyke on her personal cell phone.  She called him back.  He said he and Defendant Washington had been told she saved the offensive text messages. Defendant Turner said he was calling her that night to make sure she did not "do anything stupid."

29. On April 19, 2016, the Commander of Courts notified Deputy Polderdyke there was a vacancy in the Courts and she was going to fill it.

30. After April 19 and before May 13, 2016, the Sheriff and Undersheriff learned Defendant Washington had been harassing Deputy Polderdyke and she had saved some incriminating text messages. Rumor has it, when Undersheriff Pfannes found out he said: "That's the third strike for Washington".

31. On May 13, 2016, Deputy Polderdyke's long term boyfriend, also a Deputy, was ordered to Defendant Dunlap's office.

32. Defendants Dunlap and Washington were in the office when he arrived. They asked the boyfriend whether he knew anything about the text messages Defendant Washington sent Plaintiff. The boyfriend admitted he knew about the text messages and showed them the messages. Defendants made copies of the messages and told the boyfriend that he "need[ed] to make it right".

33. Immediately after the boyfriend left the office, Defendant Washington called Deputy Polderdyke and said: "these messages are coming up again … you need to make this problem go away".

34. In retaliation for her actions, Defendants refused to return Deputy Polderdyke to her position in the Courts. Defendants went so far as to deny a Judge's request that Plaintiff Polderdyke be assigned to her courtroom. Defendants did assign less qualified Deputies, with less seniority, to courtroom vacancies.

35. Deputy Polderdyke is a member of the Sheriff's Office Honor Guard.

36. On July 8, 2016, Deputy Polderdyke learned she would be responsible for coordinating slain Dallas Police Officer Michael Kroll's funeral. In preparation, there were several meetings with representatives from public and private agencies.

37. Defendants Dunlap and Washington attended several of the meetings.

38. At the July 12 and 13, 2016 meetings, Defendant Dunlap ordered Deputy Polderdyke to sit in a chair in between Defendants Dunlap and Washington.

39. During some meetings, Defendant Washington would move his chair close enough to Deputy Polderdyke so that his thigh almost touched hers. Every time he did that, she quickly moved away.

40. At a July 15, 2016, meeting Defendant Washington squeezed between the wall and a room full of people, walked past several open seats, and sat in the chair next to Deputy Polderdyke. He moved the chair at an angle so that he was facing her, and not the presenters. Defendant Washington tried to talk to Deputy Polderdyke during the meeting. Once she realized Defendant Washington was not talking about business related, Deputy Polderdyke turned her head away from him.

41. As they were leaving, Defendants Dunlap and Washington confronted Deputy Polderdyke and berated her about having a "negative attitude" and not being a "team player". Several eyewitnesses to the incident wrote letters to the Sheriff complaining of the manner in which Defendants treated Deputy Polderdyke.

42. On July 16, 2016, Deputy Polderdyke was advised by a representative of Signature Flight Services that, due to Defendant Dunlap's inappropriate, counterproductive and disruptive behavior, he would not be allowed into the Airport Operations Area (AOA/tarmac) for anything related to Officer Krol's burial.

43. Other than warn Plaintiff she needed to "not do anything stupid" and make the text messages "go away", Defendants did nothing to investigate, prevent or correct the aforementioned harassing behavior.

44. After Plaintiff Polderdyke's attorney served Defendants with a retention and preservation letter, Defendant County hired a private attorney who conducted an purported investigation that was just as harassing, threatening and intimidating as Defendant Dunlap and Turner's threatening phone calls.

45. Plaintiff Polderdyke filed a charge with the Equal Employment Opportunity Commission regarding Defendants' conduct.

46. On April 12, 2017, the Justice Department issued a "right to sue" letter.

**Michigan Elliott-Larsen Civil Rights Act, MCL 37.2101 et seq**
**Count I:  Quid Pro Quo Harassment**
**Count II:  Hostile Environment Harassment**
**Count III:  Retaliatory Harassment**

47. Plaintiff incorporates the preceding paragraphs by reference.

48. Plaintiff is an employee, and Defendants were employers, covered by and within the meaning of the Michigan Elliott-Larsen Civil Rights Act, MCL 37.2101 et seq.

49. While working for Defendant County, Deputy Polderdyke suffered quid pro quo harassment, hostile environment harassment, and retaliatory harassment.

50. This sexual harassment has included, but is not limited to, unwelcome sexual advances, requests for sexual favors and other verbal and physical conduct or communication of a sexual nature.

51. Defendants refused to reassign Deputy Polderdyke to the Courts because she rejected Defendant Washington's advances, saved his text messages and reported Defendants violations of law to her attorney and the EEOC.

52. Defendants Dunlap and Washington punished, berated and publicly humiliated Deputy Polderdyke during preparatory meetings in retaliation for her rejecting Defendant Washington's advances and saving his text messages.

53. Defendants' conduct during and after preparatory meetings, their phone calls telling Deputy Polderdyke "don't be stupid" and "you need to make this go away", threatened her boyfriend that he needed to talk to her and "make it right", created a hostile work environment in that the harassment was so severe or pervasive that submitting to it became a term and condition of her employment.

54. Defendant County and its agents have retaliated against Deputy Polderdyke for opposing violations of the Elliott-Larsen Civil Rights Act.

55. As a direct and proximate result of the Defendants' unlawful actions Deputy Polderdyke has suffered injuries and damages, including, but not limited to,

potential loss of earnings and earning capacity; loss of career opportunities; loss of reputation and esteem in the community; mental and emotional distress; and loss of the ordinary pleasures of life.

### Title VII of the Civil Rights Act of 1964, 42 USC 2000e et seq
### Count IV: Quid Pro Quo Harassment
### Count V: Hostile Environment Harassment
### Count VI: Retaliatory Harassment

56. Plaintiff incorporates the preceding paragraphs by reference.

57. Plaintiff is an employee and Defendants are employers, covered by and within the meaning of Title VII of the Civil Rights Act of 1964, 42 USC 2000e et seq.

58. The aforementioned conduct constitutes quid pro quo, hostile environment and retaliatory harassment in violation of 42 USC 2000e et seq.

59. As a direct and proximate result of the Defendants' unlawful actions Deputy Polderdyke has suffered injuries and damages, including, but not limited to, potential loss of earnings and earning capacity; loss of career opportunities; loss of reputation and esteem in the community; mental and emotional distress; and loss of the ordinary pleasures of life.

### Count VII: Whistleblowers' Protection Act, MCL 15.361 et seq

60. Plaintiff incorporates the preceding paragraphs by reference.

61. Defendants violated the Whistleblower's Protection Act when they discriminated against Deputy Polderdyke regarding the terms, benefits, conditions, and privileges of their employment because she reported violations or suspected

violations of a law, regulation, or rule of the State of Michigan and opposed practices made illegal by the laws, regulation, or rules of the State of Michigan.

62. As a direct and proximate result of Defendants' unlawful actions as described, Deputy Polderdyke has sustained injuries and damages, including, but not limited to, loss of earnings; loss of career opportunities; mental and emotional distress; loss of reputation and esteem in the community; and a loss of the ordinary pleasures of everyday life, including the opportunity to pursue gainful occupation of choice.

### Count VIII: Intentional Infliction of Emotional Distress

63. The preceding paragraphs are incorporated by reference.

64. Defendants Dunlap and Washington's conduct and interactions with Deputies Polderdyke during preparations for Officer Kroll's funeral constitutes intentional infliction of emotional distress.

65. Defendants' failure to assign Deputy Polderdyke to any of the court positions that opened up after she returned to work for Wayne County constitutes intentional infliction of emotional distress.

66. As a direct and proximate result of the Defendants' unlawful actions as described, Plaintiff Polderdyke has suffered injuries and damages, including, but not limited to, potential loss of earnings and earning capacity; loss of career

11

opportunities; loss of reputation and esteem in the community; mental and emotional distress; and loss of the ordinary pleasures of life.

WHEREFORE, Plaintiff requests that the court enter judgment against Defendants as follows:

1. Legal relief

    a. Compensatory damages;

    b. Exemplary damages;

    c. Judgment for lost wages, past and future; and

    d. An award of interest, costs, and reasonable attorney fees.

2. Equitable relief

    a. An order reinstating Plaintiff to the position she would have held had there been no discrimination or retaliation;

    b. An injunction prohibiting any further acts of retaliation or discrimination; and

    c. Whatever other equitable relief appears appropriate.

Respectfully submitted,

/s/ Karie H. Boylan
**BOYLANLAW, P.C.**
By:   Karie H. Boylan (P55468)
Attorney for Plaintiffs
410 W. University, Suite 201
Rochester, Michigan   48307
Phone:   (855) 926-9526
Date:  May 11, 2017         Fax:   (855) 326-9526

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**LACEY L. POLDERDYKE**

                                        Hon.
    Plaintiffs                       Case No:

v.

**WAYNE COUNTY, RAFAEL WASHINGTON,**
**MICHAEL TURNER and ROBERT DUNLAP**

    Defendants
_____/

**BOYLANLAW, P.C.**
By:    Karie H. Boylan (P55468)
Attorney for Plaintiff
410 W. University, Suite 201
Rochester, Michigan   48307
Phone:    (855) 926-9526
Fax:    (855) 326-9526
E-Mail:    karie@boylanlaw.net
_____/

**PLAINTIFF'S JURY DEMAND**

Plaintiff herein requests trial by jury of all issues so triable.

                Respectfully submitted,

                <u>/s/ Karie H. Boylan</u>
                **BOYLANLAW, P.C.**
                By:    Karie H. Boylan (P55468)
                Attorney for Plaintiffs
                410 W. University, Suite 201
                Rochester, Michigan   48307
                Phone:    (855) 926-9526
Date:  May 11, 2017       Fax:    (855) 326-9526